**STORZER & ASSOCIATES, P.C.**
Sieglinde K. Rath
Robert L. Greene, *application*
   *for admission pro hac vice pending*
1025 Connecticut Avenue
Suite One Thousand
Washington, D.C. 20036
rath@storzerlaw.com
Tel: (202) 857-9766
Fax: (202) 315-3996

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VALLEY CHABAD, INC., a New Jersey nonprofit corporation, and RABBI DOV DRIZIN, <br><br> Plaintiffs, <br><br> vs. <br><br> BOROUGH OF WOODCLIFF LAKE, N.J. and ZONING BOARD OF ADJUSTMENT OF THE BOROUGH OF WOODCLIFF LAKE, N.J., CARLOS RENDO, individually and in his official capacity as Mayor of the Borough of Woodcliff Lake, and PAUL BECHTEL, in his official capacity as Property Maintenance Officer of the Borough of Woodcliff Lake, <br><br> Defendants. | Civ. No. <br><br> **COMPLAINT** |

Plaintiffs VALLEY CHABAD, INC., a New Jersey nonprofit corporation (the "Chabad"), and RABBI DOV DRIZIN (collectively, the "Plaintiffs"), by and through their attorneys, Sieglinde K. Rath, Esq. and Robert L. Greene, Esq., Storzer

1

and Associates, P.C., hereby complain of Defendants BOROUGH OF WOODCLIFF LAKE,, N.J. (the "Borough"),  the BOARD OF ADJUSTMENT OF BOROUGH OF WOODCLIFF LAKE (the "Board"), CARLOS RENDO, and PAUL BECHTEL (collectively, the "Defendants") as follows:

## NATURE OF ACTION

1.      Plaintiffs file this action to redress violations of their civil rights caused by the Defendants' burdensome, discriminatory, and unreasonable land use regulations and intentional conduct that have prohibited and continue to prohibit Valley Chabad, Inc. (the "Chabad") from building and operating a place of worship on its property in the Borough of Woodcliff Lake, New Jersey (the "Borough"), and engaging in a continuing pattern of harassment and intimidation designed to disrupt Plaintiffs' Orthodox Jewish religious exercise in violation of the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), and the New Jersey Law Against Discrimination.

2.      Furthermore, the Defendants' land use regulations effectively preclude and unreasonably limit any new house of worship in the Borough.  Such regulations also treat various nonreligious assembly and institutional land uses more favorably than houses of worship in violation of constitutional and statutory protections of religious exercise.

2

3.     The Chabad has attempted to locate a house of worship in the Borough for over ten years at four different locations, each time prevented from doing so by the Defendants, who have been highly responsive to local residents hostile to Plaintiffs' Orthodox Jewish character.  The Chabad has been the victim of a targeted effort to prevent it from developing a house of worship in the Borough, resulting from unjustified fear and prejudice of *haredi* Orthodox Jews.  Examples of this effort include Defendant Rendo's statement that the Chabad was trying to "turn the Borough into a little Jerusalem" and fears of local residents that the Borough will become "a Hassidic place" and "a little Monsey," and that "Our town will be littered with black hats [a reference to Hassidic Orthodox Jews] walking the town on Saturdays."

4.     Defendants have also engaged in an orchestrated campaign of harassment against the Chabad including unannounced inspections, assessment and threats of assessment of fines, modifying parking regulations on the Chabad's street, threatening to take property by eminent domain, harassing a hotel manager where the Chabad holds its larger services, and threatening the tax-exempt status of its property.

5.     The Borough's onerous and discriminatory imposition and implementation of land use regulations, and the Woodcliff Lake Zoning Board of Adjustment's denial of the Chabad's application for variances (the "Application")

3

unreasonably regulate religious land uses, substantially burden the Plaintiffs' religious exercise without being the least restrictive means of achieving any compelling governmental interest, discriminate against the Plaintiffs on the basis of religion, and treat religious land uses on less than equal terms as secular assembly and institutional uses.

## **PARTIES**

6.     Plaintiff VALLEY CHABAD, INC. is a domestic nonprofit corporation formed under the Laws of the State of New Jersey in 1996.

7.     Plaintiff RABBI DOV DRIZIN is a United States citizen and a resident of the state of New Jersey.

8.     Defendant BOROUGH OF WOODCLIFF LAKE, N.J. is a municipal corporation of the State of New Jersey, having offices at 188 Pascack Road, Woodcliff Lake, NJ 07677 which, through the governing body, adopted the Ordinance in question in this matter.

9.     Defendant ZONING BOARD OF ADJUSTMENT OF THE BOROUGH OF WOODCLIFF LAKE is a board of adjustment duly appointed pursuant to N.J.S.A. 40:55D-69 to consider applications for site plan approval and variances under New Jersey's Municipal Land Use Law ("MLUL") (N.J.S.A. 40:55D-1, *et seq.*).

4

10.    Defendant CARLOS RENDO is the Mayor of the Borough of Woodcliff Lake.

11.    Defendant PAUL BECHTEL is the Property Maintenance Officer of the Borough of Woodcliff Lake.

## JURISDICTION AND VENUE

12.    The subject matter jurisdiction of this Court is founded upon 28 U.S.C. § 1331 (federal question jurisdiction) in that this action is brought under 42 U.S.C. § 2000cc *et seq.* and 42 U.S.C. § 1983.  This Court also has supplemental jurisdiction over Counts VII, VIII and IX under 28 U.S.C. § 1367(a) for claims brought under New Jersey law.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all of the events giving rise to the claims herein occurred in this District and the Defendants are subject to personal jurisdiction in this District as of the commencement of this action.

## FACTUAL ALLEGATIONS

### Plaintiffs' Religious Exercise

14.    Plaintiff Chabad was founded in 1996 for the purpose of operating a clergy residence and Chabad house within Woodcliff Lake, New Jersey.

15.    The Chabad has operated under the name of Pascack Valley Chabad Outreach Center and currently operates under the name of Valley Chabad.

16.    In 1998, the Chabad acquired the property located at 100 Overlook Drive, Woodcliff Lake, N.J. and identified on the Borough tax map as Block 908, Lot 1 (the "Property").

17.    The Property is approximately 1.27 acres in size.

18.    The Property is improved with an existing 1½ story, 3,194-square foot single family dwelling which is also used by the Chabad for some religious purposes.

19.    The Property has continuously been used by the Chabad and its Rabbi since 1998.

20.    Plaintiffs are affiliated with the Chabad-Lubavitch movement, which is a major movement within mainstream Jewish tradition with its roots in the Chassidic movement of the 18th century.  The Chabad-Lubavitch branch of Chassidism was founded in 1788. Today, Chabad-Lubavitch operates 3,500 locations in more than 85 countries.

21.    The word "Chabad" is a Hebrew acronym for the three intellectual faculties of *chochmah* -- wisdom, *binah* -- comprehension, and *da'at* -- knowledge. The word "Lubavitch" is the name of the town in Russia where the movement was founded. In 1927, Rabbi Yosef Yitzvak Schneerson was forced to leave the USSR for Latvia and then Poland, and eventually fled to the United States because of the

6

Holocaust. After his passing, Rabbi Menachem Mendel Schneerson took over as the leader of the movement.  Rabbi Menachem Mendel Schneerson is credited with establishing the movement in the United States and nurturing its spread nationally and worldwide.

22.   A part of Chabad-Lubavitch's religious mission is "[t]o create light for the sake of light, just by doing good for the sake of doing good, until all the world is filled with the serene light of G-dly wisdom 'as the waters cover the ocean floor.'"

23.   Chabad-Lubavitch teaches that all people contain a divine spark.  By welcoming all Jews into Chabad buildings of Jewish practice and learning, sometimes known as "Chabad houses," Chabad-Lubavitch seeks to transcend all labels of observant and non-observant Jews and see all Jews as integral part of the family.

24.   Chabad attempts to bring the teachings of Judaism to those who may be interested in learning about it in a nonjudgmental and non-imposing manner to each person at their own pace.

25.   Each husband and wife team, the Rabbi and Rebbetzin, who head a Chabad house are emissaries on behalf of the Chabad-Lubavitch movement to all Jews in the communities they serve, but remain organizationally independent.

26.   Chabad houses often serve as homes for Chabad-Lubavitch rabbis and their families, and will also host prayer services, Hebrew school, lectures, Shabbat

meals, and other religious events.

27.    The Plaintiffs have various programs to fulfill their religious mission, including humanitarian programs such as Friendship Circle, Linking Hearts, crisis intervention, visitation to hospitals and senior citizen homes, counseling, and teaching Hebrew and Judaism to adults, children and teens.

28.    The need to establish new Chabad houses in the world wherever Jews live is a core belief of the Chabad-Lubavitch movement.

29.    Members of the Chabad-Lubavitch movement also believe that Chabad houses serve to open the hearts of others.

30.    A rabbi and his wife operating a Chabad house can also provide the welcoming and comfortable environment necessary to break down barriers, which is central to the Chabad movement.

31.    Plaintiffs share these religious beliefs described above.

32.    The Chabad operates the only Chabad house in the Borough.

33.    The nearest Chabad houses are in Teaneck, Tenafly, Old Tappan, Franklin Lakes, Paramus, Fort Lee, and Fair Lawn, each of which serves their respective geographic areas.

34.    The majority of the Chabad congregants are drawn from the Woodcliff Lake area.

35.    The Chabad is the only Orthodox Jewish house of worship in Woodcliff

Lake.

36.   The Chabad is the only Jewish house of worship in the geographic area conducting an Orthodox Jewish service and it does not require congregants to be members, in keeping with the mission of a Chabad to be inclusive.

37.   Interest in the Chabad among those of the Jewish faith has increased in the last ten years.

38.   At present, the Chabad conducts Friday night and Saturday morning services at the Property.

39.   The Chabad is suffering significant hardships to its religious exercise resulting from its lack of an adequate place of worship.

40.   Due to demand of its congregants, the Chabad has expanded the scope of its religious mission and activities to include Jewish holiday and ritual celebrations, religious instruction, lectures, and adult programming.

41.   The Chabad cannot engage in certain religious activities because of the lack of adequate physical facilities.

42.   Other religious activities of the Chabad must presently be performed in a limited fashion or offsite at other locations that are not a house of worship.  Some of these locations include the local Hilton hotel, Park Ridge High School, a VFW hall, the Tice Center, and other similar public facilities.

43.   The types of religious activities that must be performed offsite at the

present time include: (a) celebration of high holy days including Yom Kippur and Rosh Hashanah; (b) Bar and Bat Mitzvahs; (c) weddings; (d) lectures related to Judaism; (e) religious instruction for children; (f) religious instruction for adults; (g) other celebrations of major Jewish Holidays such as Chanukkah and Purim; and (h) other service activities that benefit the community at large.

44.   The Chabad currently cannot currently host high holiday services for congregants and the larger community.

45.   All of the facilities that provide a location for off-site religious activities of the Chabad must be leased at a material cost to the Chabad.

46.   The Chabad's office staff was located in leased space at an office building in Montvale until May 2016.

47.   Congregants with small children are currently prevented from attending prayer services because there is no separate area for infants and younger children at the Property.

48.    Bar and bat mitzvahs cannot currently be conducted on site at the Property due to the capacity needed for the 100-150 on average attendees to same.

49.   Religious weddings cannot currently be conducted on site at the Property due to the capacity needed for 100-150 attendees.

50.   The Chabad frequently hosts lectures and other events for its religious community.  These lectures, which normally have about 50 attendees, cannot be

accommodated at the Property.

51.    The Chabad conducts some classes for its adult congregants such as Jewish Learning Institute courses and must use off-site space for these classes.

52.    The Chabad must currently conduct some religious instruction (Hebrew School) for children aged 5 to 13 years old off-site at the Park Ridge High School.

53.    The Chabad currently can only offer Hebrew School on Sunday mornings for two hours to a limited number of students.

54.    The Property also does not have a *mikvah*, a bath used for ritual immersion in the Jewish faith, which the Chabad believes it should provide.

55.    Limitations on these religious activities greatly burden the Plaintiffs' religious exercise.

56.    Having the various functions of the Chabad conducted at remote locations or not at all creates great religious hardship for the Chabad, including a lack of cohesion for its congregation, time constraints and pressure upon the Rabbi who must travel to all of these locations to oversee activities, great uncertainty as to whether the sites will continue to be available for use by the Chabad, and interference with the function of a Chabad which is to integrate these activities because they are part of a holistic approach to Plaintiffs' religious belief and exercise.  It also undermines the Chabad's ongoing financial viability as donors do not view the Chabad as a viable synagogue, and the Chabad has lost families and participants.

## The Property and Its Location

57.    The Property is a 1.27-acre (55,156 square feet) parcel bordered on two sides by roadways, one of which is the Garden State Parkway and the other being Overlook Drive.

58.    A farm abuts the Property to the south.

59.    To the north of the Property is vacant, forested land serving as a buffer for the Garden State Parkway.

60.    A 600-family Conservative Synagogue, Temple Emanuel of the Pascack Valley, is located across the street to the west of the Property.

61.    Single-family residences are located north of Temple Emanuel, northwest of the Property.

62.    To the east of the Property is the Garden State Parkway, on the other side of which is the Woodcliff Lake History Park, with three lighted ballfields, the Woodcliff Lake Municipal Pool, and the Woodcliff Lake Public Works.

63.    Woodcliff Lake is located approximately four miles from Monsey, New York, where a large number of *haredi* Orthodox Jews reside.

64.    Monsey has been described by the New York Times as a "Hasidic Enclave."

65.    In 1998, the Property was zoned R-5, Residential.

66.     The property was rezoned to R-30, Residential and remains zoned R-30.

67.     In 2003, the Chabad registered with the Fire Prevention Bureau of the Borough under its prior business name of Pascack Valley Chabad Outreach.

68.     The registration form indicated that the Property would be used as a Parsonage-home for Rabbi with occasional use for religious services, counseling and meetings.

69.     In August 2005, the Borough issued a Certificate of Occupancy to the Chabad stating in part: "SATURDAY SERVICES FOR FAMILY MEMBERS ONLY-15 PEOPLE MAX. PERMITTED. NO LARGE GATHERINGS PERMITTED."

70.     In or around 2008, the Chabad's attorney spoke with Borough representatives about the Chabad's use of the Property and agreed that large assemblies such as bar mitzvahs and weddings would not be held at the Property, and that its use would be limited to Friday and Saturday religious services and other occasional gatherings.  At that time, the prior "15 person" and "family member" limitations were abandoned and no new numerical limitation was established.

**The Chabad's Efforts to Locate Property in
Woodcliff Lake for a Place of Worship**

71.     Recognizing the burden that such limitations placed on the Chabad and

its congregants, in 2005 the Chabad undertook a search for a new property in the area to serve as a site for an integrated Chabad house.

72.    The Chabad sought property in Woodcliff Lake that was of sufficient size and would allow for the construction of their house of worship and related parking.

73.    Plaintiffs also require a house of worship that is centrally located to its congregants.

74.    The Chabad believes that its congregants to the greatest extent possible should walk to services on the Sabbath, the High Holidays and the numerous other religious holidays throughout the year when driving is not permitted for individuals of the Jewish faith.

75.    The Chabad also sought a property that was at least three acres in size and that had four hundred feet of road frontage to satisfy the Borough zoning code for houses of worship, as described below.

76.    Since 2006, the Chabad has identified several properties that it initially thought were suitable for the site of its house of worship.

77.    The first property Plaintiff identified was the "Hathaway" property located at 75 Werimus Road.

78.    The Hathaway property is approximately 3.89 acres in size and adjacent to property owned by the Borough.   After months of negotiations, the Chabad

entered into a contract to purchase the Hathaway property in September 2006.

79.    Shortly after going under contract, the Borough then informed the Chabad of its intention to acquire the property for "recreational" purposes.

80.    This occurred during a meeting between a Borough Councilman, Robert Rosenblatt, and Rabbi Drizin and Chabad board member Moshe Cazaz in 2006.

81.    At that time, the Borough had sufficient property devoted to recreational purposes.

82.    Upon information and belief, the true purpose of the Borough's objection to the Hathaway property being used for the Chabad's place of worship was hostility toward Orthodox Jews.

83.    At the meeting described above, Councilman Rosenblatt indicated that the Borough would consider "swapping" another vacant property that the Borough owned for the Hathaway property.

84.    The Borough never offered the Chabad another property to swap for the Hathaway property.

85.    Rather, at a second meeting with the same parties present, Councilman Rosenblatt indicated that the Borough would initiate eminent domain proceedings to acquire the Hathaway property.

86.    The Chabad subsequently terminated its contract on the property in

February 2007.

87.    The Borough subsequently acquired the Hathaway property.

88.    The Hathaway property has been sitting vacant and dormant for over ten years and has not been used for recreational purposes.

89.    The Chabad continued its search and identified other properties upon which it hoped to construct its house of worship.

90.    In 2008, the Chabad was in negotiations with owners of three adjacent parcels for sale on County Road in the Borough in order to acquire all three parcels which, in the aggregate, would provide a three-acre sized property (the "County Road" tract).

91.    They began negotiations with the Schnors, a divorced couple who owned the middle parcel.

92.    The Borough government believed that there could be interest in the County Road tract by real estate developers to build townhouses.

93.    The Borough, through Councilman Jeff Goldsmith, told the Chabad at the time that it needed ratables and should abandon its efforts to acquire the County Road tract.

94.    One of the owners of the Shnor property also learned of a developer's and the Borough's mutually aligned interests to construct a townhouse project on the County Road tract.  He would not execute a contract with the Chabad even though

his ex-wife wanted to do so.

95.    Thereafter, the Chabad abandoned these negotiations.

96.    Neither a developer nor the Borough acquired the properties during this time period.

97.    In 2011, the Chabad commenced negotiations to acquire one of the other two properties of the three on County Road which was owned by Kerlopian.

98.    This property was adjacent to the Shnor property.

99.    The Chabad and Kerlopian entered into a contract of sale for the acquisition of the property by the Chabad.

100.    The Chabad was negotiating with the third property owner, Zerella, when the Borough again indicated its strong objection to the acquisition.

101.    The Borough's stated objection was that it wanted the County Road tract developed for a townhouse project that would create tax ratable properties.

102.    Most properties within the Borough could be developed as tax ratable property.

103.    Upon information and belief, the true purpose of the Borough's objection to the County Road tract being used for the Chabad's place of worship was hostility toward Orthodox Jews.

104.    Mayor Jeffrey Goldsmith stated to the Chabad in 2011: "You can go to any other property in town--we need ratables."

105.  Upon information and belief, Mayor Goldsmith and other members of the Council held private meetings with a developer who sought to acquire the County Road tract for townhome development, which would preclude the Chabad's development.

106.  In order to construct townhouses on the County Road tract, an overlay zone needed to be created.

107.  The Borough's master plan was updated in 2008 to permit such overlay.

108.  The Borough then passed Ordinance No. 14-04, which created the overlay zone permitting townhomes to be constructed on the County Road tract.

109.  As a direct consequence of the Borough's rezoning and desire to preclude the Chabad's development of the County Road tract, Kerlopian terminated his contract with the Chabad in the Fall of 2012.

110.  In January 2013, the Chabad identified property located at 223 Woodcliff Avenue, Woodcliff Lake, New Jersey 07677, known as the "Galaxy Gardens" property, which would be a suitable site for its new house of worship, and offered to purchase that property.

111.  Galaxy Gardens is located next door to Our Lady Mother of the Church Catholic Church.

112.  Galaxy Gardens is located across the street from the Woodcliff Lake Historic Park and Woodcliff Lake Municipal Pool.

113.  The Galaxy Gardens property is slightly over two acres in size.

114.  The Galaxy Gardens property had been on the market and offered for sale for several years.

115.  Prior to entering into a contract to purchase the property, the Chabad met with Mayor Goldsmith, who stated at the time that the Borough would not oppose the acquisition of the property by the Chabad.

116.  The Chabad entered into a contract to acquire the Galaxy Gardens property in June 2013.

117.  The purchase of Galaxy Gardens was contingent upon obtaining the necessary land use approvals to permit the operation of the Chabad at the property.

118.  The Galaxy Gardens property had been used as a gasoline service station from 1925 until its current use as a landscaping and plant nursery center.

119.  Pursuant to its contract of sale, the Chabad retained the firm of Mellick-Tully to conduct a Phase I environmental assessment of the Galaxy Gardens property, which was completed in September 2013.

120. Having received the Phase I environmental assessment and understanding the implications of the environmental condition of the property, the Chabad intended to move forward with its acquisition of the Galaxy Gardens property.

121.  Contemporaneous with executing its contract for the acquisition of the

Galaxy Gardens property, Rabbi Drizin asked the Borough Mayor at time, Mayor Goldsmith, if he supported the Chabad's acquisition of Galaxy Gardens and the Mayor responded in the affirmative.

122.  Local hostility to the acquisition of the Galaxy Gardens property by Valley Chabad then began to mount.

123.  The Chabad was preparing to submit its application to secure the necessary land use approvals for the Galaxy Gardens property when Borough officials approached the Chabad and indicated it was going to acquire the property.

124.  The Borough once again began expressing an interest in acquiring a property which the Chabad was interested in for the purpose of developing an Orthodox Jewish house of worship.

125.  On October 21, 2013, the Borough placed the issue of Galaxy Gardens on the agenda for its regular meeting.  This was prior to any application for land use approval by the Borough or Board.

126.  Each of the elected Council members commented with respect to the Chabad's intended acquisition of the Galaxy Gardens property.

127.  Councilman Rosenblatt made the following statements at that hearing regarding mailings he had received:

> a.  "They are sending you this to scare you so we can divide--
> resident against resident, Jew against Jew, Catholic against

Catholic, Catholic against Jew to divide this community."

    b.  "People are trying to get you here under scare tactics.  People are trying to get you here to scare you.  Valley Chabad has not bought the property--they are contracted to buy. . . .  Why are we here? . . . .  The answer is scare tactics to get you to vote a certain way in the election."

128.   Councilwoman Bae stated "This is about keeping Woodcliff Lake the town that it is."

129. Upon information and belief, Councilwoman Bae's statements reflected hostility toward the possibility of *haredi* Orthodox Jews moving to Woodcliff Lake.

130.  One Councilman made the following statements:

    a.  "We may not like it, but at the end of the day if it meets codes and it meets zoning, we are going to lose."

    b.  "Tonight is probably the worst experience that I have ever had up here and I have been up here for 4 terms.  Watching the people attack each other . . . ."

    c.  "Your leaders are up here are not going to let something happen that the majority of the town does not want."

    d.  "We are Woodcliff Lake residents and we do not want the

character of the town to change."

131.  Upon information and belief, such statements reflected hostility toward the possibility of *haredi* Orthodox Jews moving to Woodcliff Lake.

132. Upon information and belief, such use of the term "character of the town" indicated that few *haredi* Orthodox Jews lived in Woodcliff Lake.

133. A Borough Councilman then introduced a Resolution to permit the Borough to explore options to purchase the Galaxy Gardens property.

134. That Councilman stated: "This town believes that there are better uses for that property."

135. He did not state what such uses are.

136. Councilwoman Gadaleta stated: "Let's try and save this piece of property," meaning that the property should be "saved" from the Chabad.

137. After the Borough Council meeting was opened up to public comments, local residents made various statements regarding the Galaxy Gardens issues, including the following:

>    a.  "There are people getting out of cabs and walking the streets and pointing to their house . . . . we do not need to bring an influx of people from other towns."  Upon information and belief, such "people" referred to were *haredi* Orthodox Jews.
>
>    b.  "People are scared.  There are no formal applications but this is

real."

      c.  Statements requesting an explanation of religious uses.

138.  At the conclusion of the meeting, the Borough unanimously adopted a Resolution entitled "Resolution Authorizing the Borough Attorney to Prepare and File an Application for an Open Space Trust Fund."

139.  The Resolution authorized the Borough attorney to prepare and submit an application to the Bergen County Open Space Trust Fund to assist it with its acquisition of the Galaxy Gardens property for open space, recreation and conservation purposes.

140. This Resolution was adopted notwithstanding the fact that the Hathaway Property was acquired by the Borough but never used for its stated public purpose.

141. Upon information and belief, the Borough Council's Resolution was motivated by hostility toward the possibility of *haredi* Orthodox Jews moving to Woodcliff Lake.

142. Upon information and belief, the Borough Council, in adopting the Resolution, was knowingly responsive to local residents who were hostile toward the possibility of *haredi* Orthodox Jews moving to Woodcliff Lake.

143.  The Council's ostensible reason for acquiring Galaxy Gardens was for "open space."

144.  The Council's stated reason was pretextual, designed to cover its true purpose, which was to prevent the Chabad from purchasing the property.

145.  Council member Jacqueline Gadaleta stated: "We already have approximately 20 acres that are undeveloped in town, and we don't have a clear-cut purpose for this property."

146.  Another Council member stated: "I realize how much we already own, I didn't think it was really wise to commit more of [the] taxpayers' money to a project where we don't really know what the final cost was going to be."

147.  Shortly thereafter, a map of the Galaxy Gardens property was posted to the Borough website.

148.  The Borough added "Galaxy Gardens" as an actual link page on its website home page, which still exists today.

149.  On October 28, 2013, the Borough's Planning Board had its regular meeting.  At the commencement of the meeting, the Chairman of that board made a general announcement to all present in the audience that (a) if they were at this meeting because they thought the board would be discussing Galaxy Gardens, they were mistaken; and (b) that matter would not come to the Planning Board. If an application is received regarding this site it would go to the Board of Adjustment.

150.  On November 7, 2013, the Borough adopted Resolution 13-167, which authorized the Borough to contract for an appraiser to perform an appraisal of the

Galaxy Gardens property for the purpose of acquiring it through eminent domain.

151.  Subsequently, the Borough sent a letter to the owner of Galaxy Gardens scheduling an inspection for December 20, 2013.

152.  The Galaxy Gardens property remained a subject of both Council and public comment at most of the Borough meetings throughout 2014.

153.  On February 16, 2014, the Borough Council approved Resolution No. 14-14 which approved an appraisal of Block 1402, Lot 7 (the "Galaxy Gardens" property), authorized a Phase I environmental site assessment and authorized the Borough attorney to make an offer to purchase the property.

154.  The Borough applied to the Bergen County Open Space Fund for funding to purchase Galaxy Gardens.

155.  A non-profit group, the "Responsible Citizens of Woodcliff Lake," was formed to oppose the condemnation of the Galaxy Gardens property.

156.  Even though the Borough Council was aware of the existence of the Responsible Citizens of Woodcliff Lake group, it had falsely and intentionally indicated on its application to the Bergen County Open Space Fund that there was no community opposition to the acquisition by the Borough of the Galaxy Gardens property.

157.  On May 19, 2014, the Borough adopted Resolution No. 14-106 to authorize a Phase II environmental assessment on the Galaxy Gardens property at a

cost of $29,400.00.

158.  On June 12, 2014, the Borough held a closed special meeting solely for the purpose of discussing the Galaxy Gardens property.

159.  On August 13, 2014, the Borough held a closed meeting for the purpose of discussing the Galaxy Gardens property.

160.  Related to the Galaxy Gardens/Chabad issue, Borough residents made comments such as:

   a.  "The Black Hats are going to take over the town";

   b.  "This will become another Monsey";

   c.  "Property values will diminish";

   d.  "We don't want the black hats walking all over the community";

   e.  "Our town will be littered with black hats walking the town on Saturdays";

   f.  The Borough would become "a Hassidic place"; and

   g.  The Borough would become "a little Monsey."

161.  A local resident opposition group calling itself "Concerned Neighbors & Residents of Woodcliff Lake, Inc." opposed the Chabad's use of the Galaxy Gardens property as a place of worship.

162.  One hostile resident wrote a letter to Rabbi Drizin in which she stated:

   a.  "I fail to see how the Woodcliff Lake community at large

26

benefits from same."

b.  "I do not believe Valley Chabad is an integral part of the overall Woodcliff Lake community."

c.  "I will personally pursue every available avenue to seek to thwart any efforts by any group . . . ."

163.   Another resident listed as the "president" of "Concerned Neighbors & Residents of Woodcliff Lake" sent an email reiterating her approval for the Borough's actions and appreciation of the community's support for same.

164.   One local resident wrote in a "Letter to the Editor" about the Chabad: "When you turn on that beacon of light to the entire Pascack Valley and beyond as one Chabad member said, they will come."

165.   In early November 2014, the Chabad decided not to pursue the purchase of Galaxy Gardens, given the Borough's threatened taking of the property.

166.   After the Chabad decided not to pursue the Galaxy Gardens purchase, the Borough changed its position on acquiring the Galaxy Gardens property.

167.   Borough Attorney Paul Kaufman then announced that the contract that had previously been in place between the owner of Galaxy Gardens and Chabad had been terminated.

168.   At their November 13, 2014 meeting, the Borough Council voted down a resolution to authorize an engineering firm to complete Phase II of an

environmental assessment.

169.  At that meeting, a Borough Council member, in voting no on the resolution, stated "this little two acres has consumed this town for a year and a half."

170.  Nevertheless, members of the public made statements such as "If you stop the condemnation Chabad will come back."

171.  In addition to this unsuccessful search for alternate properties in the Borough, the Chabad was also unable to utilize any other existing structures or places of worship in the Borough as its permanent home.

172.  Having engaged in an exhaustive unsuccessful search for a suitable property for over ten years, Plaintiffs decided that the only viable option was to develop its own Property on Overlook Drive as a house of worship.

## The Borough's Land Use Regulations

173.  Woodcliff Lake regulates land use in its jurisdiction in part through the Woodcliff Lake Zoning Ordinance (the "Zoning Ordinance"), Chapter 380 of its municipal code.

174.  Use of the Property is subject to the laws and regulations of the Borough, including its Zoning Ordinance.

175.  A house of worship and related religious uses is a conditional use permitted in the R-30 zone where the Property is located and in all of the residential

zones within the Borough pursuant to Section 380.13A of the Zoning Ordinance.

176. The terms "house of worship" and "related religious uses" are not defined within the Zoning Ordinance.

177. Houses of worship are prohibited in the majority of the Borough's zoning districts, including the B-1, B-2, B-3, S-O, S-OII, EAO, EAOII, AH-1, AH-2, O-R, ARHO zoning districts.

178. Section 380.13 of the Zoning Ordinance establishes nine additional criteria for the conditional use of a house of worship and related religious uses as follows: (1) Minimum lot size: three acres; (2) Lot width: 400 feet; (3) Front yard setback: 50 feet each; (4) Side yard setback: 50 feet each; 100 feet both; (5) Rear yard: 50 feet; (6) Height: 2½ stories or 30 feet; (7) Maximum building coverage: 15%; (8) Maximum impervious surface coverage: 30%; (9) Parking: one space for each three seats, plus one space for each staff member.

179. The Borough's Zoning Ordinance permits the principal use of "Municipal governmental uses. Parks, playgrounds, public schools and other municipal governmental services or uses" in its Residential Districts, including the R-30 district.

180. Parks, playgrounds, public schools and other municipal governmental services or uses are nonreligious assembly or institutional land uses.

181. The Borough's Zoning Ordinance permits the conditional use of

"Community residence for the developmentally disabled or for persons with head injuries or community shelters for victims of domestic violence" in its Residential Districts.

182. None of the permitted or conditional uses in the residential zoning districts have a requirement that the use be on a lot at least three acres in size as is required for houses of worship.

183. None of the permitted or conditional uses in the residential zoning districts contain additional criteria of the same magnitude imposed upon houses of worship.

184. Many of the permitted uses on the Property would have much greater land use impacts, including traffic and municipal service impacts, than the proposed house of worship.

185. Other nonreligious institutional and assembly uses are permitted in other zoning districts within the Borough, including nursery schools and daycare centers.

186. These other nonreligious institutional and assembly uses permitted in other zoning districts do not have a requirement that they be situated on a lot greater than three acres in size.

187. The minimum lot size for all uses other than "houses of worship" in the Residential Districts range from 8,150 feet to 30,000 square feet, all of which are

30

less than one acre.

188.  The Borough's Zoning Ordinance permits the use of "Nonregional: United States Post Office limited to serving Woodcliff Lake" in the Special Office District II zoning district with only a minimum lot size of 65,000 square feet or less than two acres.

189.  There are 1,903 parcels of land in the R-30, R-22.5, R-15, R-8.15, R-1511 and AH-1 zone districts in which houses of worship are a permitted conditional use.

190.  Only twelve properties, or 0.6%, of the parcels of land in residential zoning districts where houses of worship are permitted, satisfy the minimum three-acre lot zoning requirement for such use.

191.  Of those twelve properties, five are currently developed with single family homes.

192.  Of the seven remaining properties, three of these properties are owned by the water utility, United Water, and not available for development.

193.  Of the four remaining properties, three are constrained with environmental conditions that would render development as a house of worship impracticable

194.  The one remaining property is landlocked with no street access.

195.  There are no properties within Borough of Woodcliff Lake available to

31

accommodate a new house of worship.

196.  Upon information and belief, there has been only one house of worship approved for construction in the Borough since enactment of the three-acre lot minimum zoning requirement.

197.  The house of worship that was approved since enactment of the three-acre lot minimum zoning requirement is the Temple Emanuel, which is situated on a 15.3-acre lot.

198.  Temple Emanuel is not an Orthodox Jewish synagogue.

199.  There are presently six houses of worship located in the Borough.

200.  Of these six houses of worship, three are on parcels less than three acres in size.

201.  The Borough's zoning ordinance renders new religious land uses within the Borough effectively impracticable.

202.  New religious land use within the Borough is therefore only permitted with a use variance.

203.  The three-acre minimum lot size for houses of worship or related religious uses unreasonably provides the Borough with unbridled discretion to determine whether and where particular religious expression will be permitted.

204. The legislative determination by the Defendant Borough to impose additional criteria for the development of a house of worship and related religious

uses such as larger setbacks unreasonably provides the Borough with unbridled discretion to determine whether and where particular religious expression will be permitted.

205. Seeking a use variance, as the Plaintiffs did, involves unreasonable delay, uncertainty, and expense due to the zoning laws promulgated by the Defendant Borough, their application to the Chabad, and the hostility against the Chabad and *haredi* Orthodox Jews of Borough officials and the local community.

206. In New Jersey, an applicant may apply to the municipality's zoning board of adjustment for a "D-3" variance pursuant to the Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-70d.

207. In *Coventry Square v. Westwood Board of Adjustment*, 138 *N.J.* 285 (1994), the New Jersey Supreme Court held that a conditional use should be viewed as a permitted use rather than a prohibited use, as the governing body has established that the zoning district at issue is appropriate for such uses.

208. Under New Jersey law, the applicant for a D-3 use variance must demonstrate that the proposed use meets the positive and negative criteria to support the variance request.

209. A religious institution is considered an "inherently beneficial" use under New Jersey law, thus satisfying the positive criterion as a matter of law.

210. An applicant must also satisfy the negative criteria by demonstrating

that the variance can be granted without causing substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.

211. Because the Plaintiff's proposed use as a house of worship is an inherently beneficial use, the Board is required to conduct a four-part test set forth in *Sica v. Board of Adjustment of Tp. of Wall*, 127 N.J. 152, 162-166 (1992), to determine whether the use meets the statutory negative criteria.

212. If the Board identifies any negative impacts, it must then determine whether these detrimental effects can be reduced by imposing reasonable conditions on the use.

213. A "D" variance requires a supermajority or five affirmative votes for approval.

214. Consideration by the Zoning Board of Adjustment of a "D" variance is an individualized assessment of the proposed use for the property involved.

215. New Jersey law and the Board's Rules Governing Internal Affairs require that the Zoning Board of Adjustment must issue a decision on a use variance within 120 days after an application is deemed complete.

216. If a decision on a use variance is not issued by the Board within 120 days, the applicant is entitled to receive an automatic approval under New Jersey law.

217.  In New Jersey, an applicant seeking bulk or "C" variances,  must apply to the municipality's zoning board of adjustment for such relief.

218.  Under New Jersey law, the applicant must demonstrate that such relief satisfies the positive and negative criteria to support the variance request.

219.  A "C" variance requires a simple majority for approval.

**The Variance Application and
Community Hostility to the Chabad's Religious Land Use**

220.  On September 12, 2014, the Chabad applied to the Borough of Woodcliff Lake Building Department for a building permit to remove the existing structure and construct its small house of worship on its Property.

221.  The proposed Chabad building would have had a sanctuary.

222.  The proposed Chabad building would have a social hall.

223.  The original proposed sanctuary and catering hall together had seating for 324 individuals.

224.  On September 25, 2014, the Borough Zoning Officer denied the application based upon the property not meeting the minimum lot size, various setbacks, coverage and accessory structure requirements of the Borough's Zoning Ordinance.

225.  On October 20, 2014, the Chabad filed an appeal of the September 25, 2014 decision of the Zoning Officer of the Borough of Woodcliff Lake to the

Defendant Woodcliff Lake Borough Zoning Board of Adjustment seeking to remove the existing structure and construct its approximately 20,000 square foot house of worship with 88 parking spaces.

226.  A use variance was sought with respect to the three-acre minimum lot size requirement.

227.  Variances were also sought for several other Zoning Ordinance requirements, including minimum lot frontage, building height, maximum stories, buffer zone and setbacks.

228.  Chabad also requested "waivers" from other requirements, including driveway aisle width, parking lot landscaping, size of shrubs and refuse storage.

229.  Pursuant to New Jersey state law, the Chabad's application was "complete" on December 4, 2014.

230.  On November 20, 2014, the application was deemed not approved by the Borough Fire Department due to various issues including access issues.

231.  Following several meetings between the Chabad and the Borough Fire Department in an effort to meet all of the Fire Department's concerns, on March 23, 2015, the Borough Fire Department approved the Chabad's plans with conditions agreed to by the Chabad including widening the roadway and access issues.

232.  Subsequent to the initial application submission, the Chabad in good faith modified its plan in many substantive ways to provide for Zoning Ordinance

compliance for its proposed house of worship and at the request of the Board.

233. With respect to its use variance application, these included several substantive revisions: (a) the original front yard setback was 48.5 feet and is now 50 feet; (b) the original rear yard setback was 49.0 feet and is now 50 feet; (c) the original side yard setback was 47.3 feet is now 50 feet; (d) the original maximum height of the proposed Chabad building was 3½ stories and 44 feet in height and is now 2 stories with 33 feet in height (still requiring variance for 3 feet); (e) the original maximum building coverage was 18% and is now at 16.1% requiring a variance for a 1.1% deviation; (f) the original maximum impervious coverage was 74.9% and is now 70.8% (still requiring a variance for the 40.8% deviation).

234. The number of parking stalls required is based upon the number of seats in the house of worship. There is one space required for each three seats plus one space for each staff member under the Zoning Ordinance.

235. The Chabad initially proposed 324 seats and 73 parking spaces when 108 spaces were required.

236. The Chabad later proposed 219 seats and 73 parking spaces for which 73 spaces are required.

237. In addition to the use variance, the Chabad sought several bulk or "c" variances for items such as a retaining wall, buffers, steep slopes and landscaping.

238. Subsequent to initial application submission, the Chabad modified its

plan in many substantive ways to provide for zoning code compliance for the bulk requirements and at the request of the Board.

239.  The initial application proposed a retaining wall exceeding 20 feet in height and setback one foot from the property line on three sides of the property with no landscaped tiers.

240.  The new plan has been revised so that the setbacks are ten feet, two and a half feet, and one foot from the property lines and two tiers on one side at 14.5 feet.

241.  The initial application did not provide for any landscaped buffer or buffer at all when a 30 foot buffer was required.

242.  The new plan includes a 21.7 foot buffer with the two tiered retaining wall with 35 Koreanspice Viburnum on the second tier, a five-foot aluminum fence and guardrail.

243.  The initial plan sought a variance for no landscaping in the parking area.

244.  The new plan proposes 1,647 square feet of parking lot landscaped area and a variance is no longer required.

245.  The south deck was eliminated in the new plan.

246.  In addition to the variance requests, the Chabad sought several design waivers.  These are deviations from zoning code requirements for which a variance is not required.

247.  Subsequent to the initial application submission, the Chabad modified its plan in many substantive ways to provide for zoning code compliance with design standards at the request of the Board.

248.  The initial application sought a six-foot fence where five feet is permitted.

249.  The new plan proposes a five-foot fence and a variance or waiver is no longer required.

250.  The initial application sought two monument signs, each of which measured six by ten feet when the zoning code permits one sign up to twenty square feet.

251.  The new plan proposes one twenty square foot sign and a variance or waiver is no longer required.

252.  The initial plan did not provide for any refuse area.

253.  The new plan provides for such an area and a variance or waiver is no longer required.

254.  The initial lighting plan did not comply with the lighting code of 1.0 foot-candle at the property line.

255.  The new lighting plan has been revised to comply and a variance or waiver is no longer required.

256.  The initial landscaping plan proposed shrubs at a height of 15 to 18

inches where 24 inches is required.

257.  The new landscaping plan has been revised to comply and a variance or waiver is no longer required.

258.  The initial plan proposed 1.8% of the parking lot to be landscaped where 5% is required.

259.  The new plan proposes a 6.3% landscape area and a variance or waiver is no longer required.

260.  With the new plan, sixteen variances and waivers were eliminated and nine variances and waivers were reduced in intensity.

261.  The proposed building would accommodate the religious needs of the Chabad.

262.  The proposed house of worship would accommodate holiday services on site, with multiple services offered each day.

263.  The proposed house of worship would accommodate a separate area for daycare for very young children during prayer services.

264.  The proposed house of worship would accommodate a separate area for a youth service for children during the conducting of regular and holiday prayer services.

265. The proposed house of worship would accommodate bar and bat mitzvahs.

266. The proposed house of worship would accommodate life cycle events.

267. The proposed house of worship would accommodate most lectures.

268. The proposed house of worship would accommodate religious classes on site.

269. The house of worship would accommodate an expanded Hebrew School including another night of instruction each week in addition to the Sunday morning classes and an expansion of that time period.

270. The proposed house of worship would provide a *mikvah*.

271. The proposed house of worship would have space for administrative offices for three to five staff members who would also serve as teachers for religious instruction and two Rabbis.

272. The Chabad's application took <u>628</u> days and <u>eighteen</u> public hearings from the date of completion of the application to the vote of the Board.

273. This was 508 days longer than the permitted period for hearing variances.

274. The Chabad was requested to, and did, consent to several extensions by the Board.

275. As a practical matter, a use variance applicant is forced to consent to extensions, for fear of denial if the Board wishes to continue to hear testimony on the matter.

276.  Such extensions constituted unreasonable delay and expense to the Chabad.

277.  Eighteen hearings were held on the Plaintiff's application before the Board on December 16, 2014, February 17, 2015, February 24, 2015, March 24, 2015, April 28, 2015, May 26, 2015, June 23, 2015, July 28, 2015, September 9, 2015, September 24, 2015, November 24, 2015, March 29, 2016, May 24, 2016, June 14, 2016, June 28, 2016, July 26, 2016, August 16, 2016 and August 23, 2016.

278.  Various objectors were represented by counsel at several of these hearings.

279.  The first hearing on Plaintiffs' Application was held on December 16, 2014.

280.  Subsequent to that hearing, the plans were revised to accommodate the Borough fire department's request for 360-degree circulation for fire vehicles.

281.  The Chabad returned to the Board for a hearing on its application on March 29, 2016.

282.  The Chabad was unable to present any testimony at that hearing as the Board focused solely on two issues.  The first was whether a new application should be filed in light of the Chabad's revision of its plans to have a smaller southerly retaining wall at the property.  The second was whether the agency that manages the Garden State Parkway, the New Jersey Turnpike Authority, had commented on the

project.

283.  The Board's focus on a State agency's comments or decision on a separate application was unreasonable and contrary to law, as N.J.S.A. 40:55D-22.b provides that the Board shall issue its Resolution conditioned upon approval from another governmental agency so as not to delay the application.

284.  Despite counsel for the Chabad referring the Board to this New Jersey statute, the Board and its attorney repeatedly raised the issue of receiving comment from the New Jersey Turnpike Authority as a prerequisite for continued consideration of the Chabad's application.

285.  The Board Chairwoman stated, contrary to law: "I want to know before I make a decision what they think. All right? Or -- and they should know and I -- what we think also."

286.  This was an attempt to delay and increase costs for the Chabad.

287.  The application was next heard at the Defendant Board's May 24, 2016 hearing.  During the course of the testimony of the traffic engineer for the Chabad, one Board member questioned using the standard criteria for trip generation commenting: "[B]ut the numbers don't really mean anything or justify it to me, because it's not in northern Bergen County. You have a higher Jewish population, a lot more synagogues and temples."

288.  The public was also allowed to question the traffic engineer at length

including asking irrelevant questions demonstrating hostility such as:

    a.  "I don't expect to get an answer, but I want to know what all this is going to do for me and my home? What is it going to do?"

    b.  "I wondered if there had been any other reports of what I've seen, which was people getting off of the Parkway and running down the grassy berm area at Overlook and Saddle River Road?"

    c.  "With regard to these adult education classes and ongoing lectures, are you aware that the rabbi has e-mailed people out as far away as West Paterson, New Jersey, inviting them to come to these classes and seminars?"

    d.  "Exactly, pedestrians will be all over the place."

289.  At the May 26, 2015 hearing, Rabbi Drizin testified and was asked irrelevant questions focusing on religious and other issues by the Board attorney:

    a.  "You mentioned that the Valley Chabad is an orthodox synagogue? My question is, do you have to be orthodox to attend?"

    b.  "So for the services on the high holy days, Rosh Hashanah and Yom Kippur, you could go to either Temple Emanuel or

you could go to Valley Chabad, if you were Jewish?"

c.  "In the context of the service itself, would the service for the high holy days be the same or similar at Valley Chabad as it would be at Temple Emanuel?"

d.  "Do you know, if you did get approval for Valley Chabad, whether or not you will have any adverse impacts with any others, such as Temple Emanuel?"

e.  "I asked you the number of families on the mailing list in Woodcliff Lake.  What town has the next highest number of families on your mailing list after Woodcliff Lake?"

290.  The objectors' attorney questioned the Rabbi about the Chabad's operating budget in 2015 and then stated: "[I]t goes to the credibility of the temple as to the funds they have available to build."

291.  One member of the public questioned the Chabad's planner at the June 23, 2015 hearing as follows:

> You didn't see people walking three, four abreast in the road? Cars going into the oncoming traffic to avoid them? Do you ever see them on a dark winter night when you can't see them at all , and they have to dive into the woods to see the car or the car sees them at the last minute?

There is ample width to Overlook Drive to accommodate two way flow and those individuals walking to the Chabad for services.

292.  After approximately a year and a half of hearings, the Chabad's

45

attorney advised the Board that they had more than 120 days, or until August 31, 2016, to finalize consideration of the application and vote on the application.

293. The Board's attorney engaged in lengthy, irrelevant and repetitive questioning of the Chabad's engineer, including asking questions such as "Are you aware of any flooding issues involving the Musquapsink Brook?," which had nothing to do with the Application.

294. Members of the public also engaged in irrelevant examination of the Board's engineer, asking questions such as:

> a. "[I]t looked like the Mikvah was moved to the second floor from originally being maybe either on the basement or the ground floor, is that correct, it's been moved up? . . . . Yeah. Can you explain a little bit about maybe why your client requested that. It seems like a very unusual thing to have a large -- what's basically like a miniature pool filled with water, very heavy, and put that on the second floor."
>
> b. "So it's possible to -- to have a fully functioning mikvah on the second floor?"
>
> c. "And if these chambers that are going to be holding the water ever were to back up or we had a major storm and the Parkway was to be flooded, would -- could -- is there any way the town

46

could be held liable in any way for that?"

    d. "And did your client, like -- did he share any information as to why -- why does this house of worship contain a mikvah?"

295. The Board questioned why Rabbi Drizin was not present for cross-examination "despite his presence being requested" by the Chairwoman of the Board.

296. In response to the Chabad attorney indicating that the Rabbi had already testified and would not be returning, the Board attorney indicated he would issue a subpoena for Rabbi Drizin to appear at the next Board meeting.

297. The Borough Construction Official was called as a witness by a member of the public. Questioning of this official by members of the public included irrelevant topics such as the following:

    a. The activities of the Chabad in 2005.

    b. Why the Chabad was listed as a house of worship on the Borough's website.

    c. Whether showing films and charging an admission is allowed in residential homes.

298. A member of the public, former Mayor Joseph LaPaglia, was called as a witness by the Board. He testified that it was "total bullshit" that the Chabad claims there are no three-acre lots in the Borough. He suggested that the Y in Washington

Township was vacant and "would have been perfect for what the applicant wants and needs."

299.  On August 23, 2016, the Board conducted its final hearing on the Chabad's application.

300.  Again the issue of the nearby Orthodox Jewish community in Monsey was raised by the public.

301.  The Board Chairperson stated at the August 23 hearing that Chabad should locate elsewhere, outside of the Borough.

302.  The Board's attorney also stated that the Chabad should locate outside of the Borough.

303.  Previously, the Board's attorney asked Rabbi Drizin: "So is Woodcliff Lake the only place that you would consider?"

304.  The Board's Planner, who testified at the August 23 hearing, did not state that any negative impacts would in fact occur as a result of the Chabad's use, only suggesting that there "could" be such impacts.

305.  During the public comment portion of the hearing, the Board limited the Chabad's witnesses to two minutes of testimony each, but allowed an opponent four minutes to testify against the application.

306.  The Board's attorney further improperly read out another objector's statement for more than three minutes.

307.  One Board member admitted during the August 23 hearing that there were no lots in the Borough where a house of worship could locate.

308.  Board member Gary Newman indicated that he believed the Board should approve the Chabad's application subject to conditions and enumerated same for the Board.

309.  Despite Mr. Newman's caution to the Board, the Board voted unanimously to deny the Chabad's application.

310.  On October 6, 2016, the Defendant Board issued its Resolution denying the Chabad's application.

311.  The Board Resolution contained several findings regarding the Chabad's application that were wholly unsupported by the evidence before it.

312.  The Resolution included a finding that the residential character of the neighborhood would be adversely impacted because the proposed use would be highly visible from the roadway and nearby properties.  However, most of the building is not visible from the West; to the East is the Garden State Parkway; to the North is a vacant parcel owned by the Garden State Parkway and to the South, where the property will be visible with a large retaining wall on the southery portion of the property, is an egg farm, the owner of which does not object to the use.

313.  The Resolution also included a finding that there would be substantial and significant adverse impact to the surrounding residential neighborhoods based

49

upon inadequate parking.  However, the parking proposed by the Chabad complies with the Code and services for High Holy Days, when there is an increase in attendance, could be staggered, held at different times, or held off-site.

314.  The Resolution included a finding that without sufficient on-site parking, there will be an overflow of parking into the residential neighborhoods, most notably on Mill Road Extension and neighborhoods to the West.  However, the Borough has prohibited parking on Overlook Drive, where the Chabad is located, by ordinance during the course of the Application and overflow situations would be a rare occurrence, if at all.

315.  The Resolution included a finding that there are numerous pedestrian hazards along Overlook Drive, which has a 40 mph speed limit with insufficient lighting.  However, there are some members who have walked to services at the Chabad for many years without incident.  Although pedestrian traffic would increase some during high holy days, it would not be dramatic or create a hazard.

316.  The Resolution also included a finding that there is an issue of pedestrian safety due to the fact that there are no sidewalks on Overlook Drive and those wishing to walk to the subject site would encounter insufficient shoulders to walk.  However, there are no sidewalks along the roadways in residential districts in the Borough, where places of worship are permitted.

317.  The Resolution also included a finding that the proposed Chabad house

is also likely to cause additional erosion and flooding of the Musquapsink Brook, which has been delineated a flood hazard area by the State of New Jersey. However, the Board engineer himself testified several times that the Chabad's application met all drainage requirements and the flooding potential has existed for years since four municipalities have flow into the brook. Claiming that the Chabad's use would have such impact is wholly unreasonable.

318. The Resolution's conclusion that "The Board also finds that the submitted drainage plan would contribute to known flooding conditions" is based on no evidence and is wholly arbitrary and capricious.

319. Significantly, and contrary to law, the Resolution included a finding that there are other larger available properties for the Chabad in the Borough or surrounding municipalities. Such facts have no relevance to the Board's determination of a D variance.

320. Nevertheless, none of the Resolution's five listed properties in the Borough are suitable or available to the Chabad as a site for its house of worship.

321. The Defendant Board suggested that "property located at 291 Chestnut Ridge Road" was 3.4 acres in size, when in fact that lot is 1.2 acres in size.

322. The Defendant Board also stated that a lot at "1220 Brookview Drive" was available for the Chabad. There is no such address in Woodcliff Lake.

323. The property located at 256 Pascack Road, also suggested by the Board,

has only approximately one-half of the required road frontage necessary for a place of worship.

324.  A subdivision request to place just two residences on the 256 Pascack Road property was withdrawn in 2014, which needed variances for lot frontage, after the Planning Board expressed great hostility to such proposal.

325.  The property at 256 Pascack Road is within a floodplain.

326.  The Board also referred to an unidentified "property located on Pascack Road (south) of 6 acres."  There is no property six acres in size on Pascack Road.

327.  The property located at 27 Pascack Road, also suggested by the Board, had nowhere near the required lot width for a place of worship and has only approximately 75 feet of road frontage.  Neither could that property meet the required setbacks for a place of worship.

328.  The Board's inability to demonstrate even one single parcel where the Chabad could locate in Woodcliff Lake demonstrates the lack of any available property that meets the Borough's onerous zoning requirements for place of worship.

329.  Suggesting that the Chabad should locate in Washington Township further demonstrates hostility toward the Chabad on the part of the Defendant Board.

330.  Also contrary to New Jersey law, the Board refused to impose any reasonable conditions on the Chabad that could mitigate any perceived negative impacts.

331.  One proposed condition was that occupancy be limited to 219 persons. The Board actually rejected this condition, in part, because "such a limitation would also not satisfy the needs of the Chabad."

332.  The Resolution irrationally stated that "[v]ariance relief is still required as the parking is 54 spaces less than what is required," even though the same paragraph admits that "Applicant proposes reducing the number of seats to 219 and proposes 73 spaces."

333. Seventy-three parking spaces complies with the Borough's code requirement of one space for every three seats.

334.  The Board acted contrary to law by not utilizing the four step analysis for inherently beneficial uses as established in Sica v. Board of Adjustment of the Township of Wall, 927 N.J. 152 (1992), in determining the Chabad's application.

335.  The Board acted contrary to law in only analyzing the Chabad's application pursuant to the conditional use analysis in "[Coventry] Square, Inc. v. Westwood Board of Adjustment, 138 N.J. 285 (1994),"[1] and failing to engage in the required Sica analysis of the Chabad application.

336.  The Board erroneously found that the Chabad had failed to comply with its request to produce a rendering of the retaining wall system and landscaping as

---

[1] The Board referred to the case as "Country Square, Inc. v. Westwood Board of Adjustment, 138 N.J. 285 (1994)," further demonstrating its lack of awareness of controlling law.

there is no legal requirement to do so.

337.  The Board did not approve the site plan for the Chabad based upon erroneous grounds that were often contrary to law.

338.  The Board determined that the Chabad's drainage plan requires the consent and approval of the New Jersey Turnpike Authority and that had not been obtained.

339.  N.J.S.A. 40:55D-22.b provides that the Board shall issue its Resolution conditioned upon approval from another governmental agency so as not to delay the application.

340.  The Board also determined that the retaining wall abutting the Garden State Parkway property was not approved by the New Jersey Turnpike Authority.

341.  This proposed wall is not on property owned by the Garden State Parkway.  It is on the Chabad's property and as such requires no approval from the Garden State Parkway, the adjacent property owner.

342.  The Board also determined that insufficient details were given with regard to the safety pertaining to the retaining wall system.

343.  The only testimony regarding the safety of the retaining wall was provided by the Chabad's expert and it was not refuted in any fashion.

344.  The Board also determined that no provision was made for accumulation of snow during the winter months.

345. There was testimony for the Chabad that it would use some of the parking spaces to contain the snow or have it removed from the site.

346.  There is no rational, much less compelling, basis to prohibit the Chabad from operating a house of worship on the Property.

347. The Board's denial of Plaintiff's use variance severely impedes and prevents the Chabad's exercise of its religion.

348. The Defendants' laws and actions have rendered the Plaintiff's religious exercise effectively impracticable.

349. In denying the Chabad's Application, the Defendant Board was knowingly responsive to local residents who were hostile toward the possibility of *haredi* Orthodox Jews moving to Woodcliff Lake.

350.  The renovation of the Plaintiff's proposed Chabad, at an estimated cost of $5,000,000, would affect interstate commerce.  The construction's effect on interstate commerce would result from, amongst other things, the Chabad's fundraising activities related to the renovation; the transfer of funds to those it engages to renovate the Chabad; the engagement of construction companies to renovate the Chabad; the employment of and payments to construction workers either by the Chabad or by companies engaged by it; the purchase of necessary materials to renovate the Chabad; the engagement of a landscaping company; the use of interstate highways for the transportation of persons and materials used to

renovate the Chabad; the use of interstate communication related to the renovation of the Chabad; and other activities related to the renovation of the Chabad.

351.  The operation subsequent to the Chabad's renovation would affect interstate commerce.  The Chabad's operation would affect interstate commerce by or through, amongst other things, serving as a site for ongoing fundraising; its receipt of charitable donations from persons working or living outside of the State of New Jersey; the use of means of interstate communication to facilitate the Chabad's ongoing operations; the use of interstate travel related to the Chabad's ongoing operations; the employment of any part-time or full-time employees; and the purchase of goods and services related to the Chabad's ongoing operations and maintenance.

## Other Examples of the the Borough's Pattern of Harassment Against the Chabad

352.  Pursuant to New Jersey law, real property owned and used by a religious organization for a religious purpose is generally exempt from taxation.

353.  The Chabad's Property qualifies for this exemption.

354.  The Chabad has applied for this exemption for more than sixteen years.

355.  The Chabad did not receive the exemption from the Borough until tax year 2016.

356.  Borough code inspectors have immediately visited the Property to

perform unscheduled inspections after the Chabad applied for the exemption.

357.  The result of these inspections was the issuance of a fine by the Borough for overcrowding at the Chabad.

358.  In June 2005, a Borough code inspector conducted what he classified as a "periodic" and unscheduled inspection of the Property.

359.  This occurred on the eve of a religious lecture at the Property.

360.  The report of the Borough inspector was copied to the Borough Tax Assessor, Construction Official and Fire Official.

361.  As a result of this unscheduled inspection, the property was cited for six violations and a fine of $5,000.00.

362.  A Borough zoning officer has also conducted unscheduled visits to the Property.

363.  On or about 2006, the Borough zoning officer sent the Chabad a letter demanding that it remove a small shed, or the Chabad would be fined.

364.  Upon information and believe, the Borough has not taken such action against other property owners who erected similar sheds on their property.

365.  The police have also been called by Borough officials to go to the Property even though there has been no criminal offense occurring.

366.  One such instance occurred on September 24, 2005.

367.  Upon information and belief, such harassment by Borough officials was

motivated by hostility toward Orthodox Jews.

368.  On February 22, 2016, the Borough introduced Ordinance number 16-02 and adopted the Ordinance on March 7, 2016.

369.  The Ordinance amended the no-parking ordinance to prohibit parking on both sides of the entire length of Overlook Drive.

370.  Upon information and belief, this Ordinance was introduced and adopted solely for the purpose of targeting the Chabad.

371.  At the direction of Defendant Rendo, the police chief of the Borough was instructed to erect "No Parking" signs on Overlook Drive.

372.  During the period in which the Chabad attempted to purchase Galaxy Gardens, Defendant Rendo stated that Rabbi Drizin was "trying to turn the Borough into a little Jerusalem."

373.  Defendant Rendo made other statements hostile to the Chabad.

374.  At a meeting of a group of Woodcliff Lake residents organized to oppose the Chabad's existence in the Borough, Defendant Rendo stated: "You vote for the Republicans and I'll take care of Chabad."

375.  Subsequent to such meeting, members of that group made various phone calls to Borough residents supporting Republican candidates and sent a letter endorsing the Republican party.

376.  Other Borough councilmen attended meetings of the group opposed to

the Chabad.

377.  Defendant Rendo "tweeted" "So the Democrats want to bring Galaxy Gardens back as an issue.  I welcome it as it gave us two landslide victories." on the Twitter social media platform.

378.  Defendant Rendo was knowingly responsive to residents of Woodcliff Lake that opposed the Chabad's existence within the Borough based on its religious denomination.

379.  Recently, the Chabad had arranged for services to observe the 2016 Yom Kippur holiday to be held at an offsite location, the Hilton Woodcliff Lake.

380.  In October 2016, Defendant Bechtel contacted a manager at the Hilton Woodcliff Lake demanding information about the Chabad's religious service.

381.  Defendant Bechtel asked the Hilton manager questions such as whether a permit was obtained to hold such service, how many people were to be attending, and who was catering the event.

382.  Valley Chabad has held services at the Hilton Woodcliff Lake for many years, and a permit has never been required to do so.

383.  The Defendant Bechtel had no reason to telephone the Hilton Woodcliff Lake regarding Yom Kippur services prior to the services being held other than to harass and intimidate the Chabad.

384.  In or about September 2016, Defendant Bechtel sent a letter to the

owner of real property in the Borough, Alfred Thumim, who was at his Florida property at the time.

385.  Mr. Thumim owns property at 51 Mill Extension Road, Woodcliff Lake, New Jersey.  The property is one and two-thirds acres in size and improved with a 6,500 square foot home.

386.  The letter indicated that Mr. Thumim was being assessed a fee for renting the property.

387.  Mr. Thumim had a conversation with Defendant Bechtel on a weekend day in early October 2016, and explained that he did not rent the property, but still maintained his residence there and donated part of the property to the Chabad to use as a residence for Rabbi Orenstein and his wife and family and teachers as needed since the home contains a separate apartment in the basement.  Rabbi Orenstein is employed by the Chabad.

388.  Defendant Bechtel advised Mr. Thumim that classes were being conducted at the property, which Mr. Thumim denied.

389.  The arrangement between Mr. Thumim and the Chabad has occurred for a period of nine years without complaint or incident from the Borough.

390.  Defendant Bechtel advised Mr. Thumim to send a letter to him outlining what they had discussed.

391.  On October 27, 2016, Defendant Bechtel and another Borough official

arrived at 51 Mill Road Extension, where Rabbi Yosef Orenstein and his wife, Ester, also a Chabad employee, and their family reside.

392.  The two Borough officials announced that they were there to perform their "annual inspection" of the property where Rabbi Orenstein and his family reside.

393.  Upon information and belief, there are no "annual inspections" of residential properties conducted in the Borough and this unscheduled visit to this property by these two Borough officials was solely for the purpose of harassing and intimidating a Chabad Rabbi.

394.  In the six years that Rabbi Orenstein and his family have resided at this property, there has never been an "annual inspection."

395.  Ester Orenstein was at the residence during the time of the "annual inspection."  She had no prior knowledge of any inspection and permitted the Borough officials access to her home.

396.  The two Borough officials indicated they would be back for another fire inspection on November 1, 2016.

397.  Upon information and belief, Defendant Mayor Rendo, together with at least one other Borough Councilman, discussed how the Borough could eliminate the Chabad property's tax exempt status granted to the Chabad by the Borough tax assessor.

398.  Whether to grant an exemption with respect to real property situated within the Borough is a legislatively imposed independent decision of the Borough tax assessor without any undue influence from others including Borough officials.

399.  Defendant Rendo has further publicly stated that the Chabad's reference to its rights under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*, and the Civil Rights Act, 42 U.S.C. § 1983, was "unacceptable" and "absolutely ridiculous."

400.  The actions taken against the Chabad by Defendants were motivated by hostility toward the Chabad's religion and religious denomination, and its exercise of fundamental rights.

401.  Under federal law, it is clearly established that governmental actors may not substantially burden religious exercise without using the least restrictive means of achieving a compelling interest, or discriminate against a religious assembly or institution on the basis of religion or religious denomination.

402.  Under New Jersey constitutional law, it is clearly established that a minister may use his or her home for limited religious services and activities.

403.  The actions taken by Defendants Rendo and Bechtel against the Chabad were malicious and in bad faith.

404.  The actions taken by Defendants against the Chabad violated the Chabad's clearly established statutory and constitutional rights.

62

405.  The Defendants' actions described above all took place under color of state law.

406.  The Board was informed of the applicability of RLUIPA to its actions and in fact referenced consideration of same in its Resolution denying the Chabad's application.

407.  The harm to the Plaintiffs caused by the Defendants' laws and actions, which prevent it from using the Property as a house of worship to accommodate its religious needs, is immediate and severe.

408. Defendants' laws and actions imminently threaten to substantially burden the Plaintiffs' free exercise of religion.

409. There are no quick, reliable and viable alternative options for the Chabad's operations.

410.  The Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' wrongful laws and actions.

411. The Plaintiffs have also suffered significant financial damages as a result of the Defendants' laws and their application to the Chabad.

## **COUNT I**

Violation of Religious Land Use and Institutionalized
Persons Act of 2000 – "Substantial Burdens"
42 U.S.C. § 2000cc(a)

412.  Paragraphs 1 through 411 are incorporated by reference as if set forth fully herein.

413.  Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that places substantial burden on the Plaintiffs' religious exercise without using the least restrictive means of achieving a compelling governmental interest.

## COUNT II

Violation of Religious Land Use and Institutionalized
Persons Act of 2000 – "Nondiscrimination"
42 U.S.C. § 2000cc(b)(2)

414.  Paragraphs 1 through 413 are incorporated by reference as if set forth fully herein.

415.  Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that discriminates against the Plaintiffs  on the basis of religion and religious denomination.

## COUNT III

Violation of Religious Land Use and Institutionalized
Persons Act of 2000 — "Exclusion and Limits": Unreasonable Limitation

42 U.S.C. § 2000cc(b)(3)(B)

416.  Paragraphs 1 through 415 are incorporated by reference as if set forth fully herein.

417.  Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that unreasonably limits religious assemblies, institutions, and structures within their jurisdiction.

## COUNT IV

Violation of Religious Land Use and Institutionalized
Persons Act of 2000 — "Equal terms"
42 U.S.C. § 2000cc(b)(1)

418.  Paragraphs 1 through 417 are incorporated by reference as if fully set forth herein.

419.  Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that treats religious land use on terms that are less than equal to nonreligious assembly and institutional land uses.

65

## COUNT V

United States Constitution
42 U.S.C. § 1983: First Amendment
Free Exercise of Religion

420.  Paragraphs 1 through 419 are incorporated by reference as if set forth fully herein.

421.  Defendants have deprived and continue to deprive the Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by implementing and imposing land use regulations both on their face and as applied in a manner that substantially burdens the Plaintiffs' religious exercise without using the least restrictive means of achieving a compelling governmental interest, and discriminates against the Plaintiffs on the basis of religion in a manner that is not the least restrictive means of achieving a compelling governmental interest.

## COUNT VI

United States Constitution
42 U.S.C. § 1983: Fourteenth Amendment
Equal Protection

422.  Paragraphs 1 through 421 are incorporated by reference as if set forth fully herein.

423.  Defendants have deprived and continue to deprive the Plaintiffs of their

66

right to equal protection of the laws, as secured by the Fourteenth Amendment to the

United States Constitution, by implementing and imposing land use regulations both

on their face and as applied in a manner that discriminates against them on the basis

of religion.

## COUNT VII

The Board's decision denying the use variance
was arbitrary, capricious and unreasonable

424.  Paragraphs 1 through 423 are incorporated by reference as if set forth

fully herein.

425.  Plaintiffs satisfied their burden of proof on the variance requests and

their Application should have been granted.

426.  The Court should decide all remaining issues unresolved by the Board

because remand will likely subject Plaintiffs to further protracted hearings at

additional large expense.

## COUNT VIII
New Jersey Common Law
*Sica v. Bd. of Adjustment of Twp. of Wall*

427.  Paragraphs 1 through 426 are incorporated by reference as if set forth

fully herein.

428.  The Board failed to comply with the requirements in *Sica v. Board of*

*Adjustment of the Twp. of Wall*, 127 N.J. 152 (1992), in that the Board failed to impose conditions to alleviate any perceived detriments which would flow from the grant of the requested variances, including the conditions agreed to by the Plaintiffs during the course of the many public hearings.

## COUNT IX

New Jersey Law Against Discrimination,
N.J. Stat. Ann. § 10:5-12.5

429.  Paragraphs 1 through 428 are incorporated by reference as if set forth fully herein.

430.  By denying Plaintiffs, on the basis of religion, the opportunity to obtain the accommodations, advantages, facilities, and privileges of ownership of real property, Defendants violated and continue to violate Plaintiffs' rights under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*

431.  Defendants' conduct has caused significant damage to Plaintiffs.

432.  Defendants are liable for the damage caused to Plaintiffs, and should be enjoined from further violating Plaintiffs' rights.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court grant the following relief:

1.  A declaration that the Borough of Woodcliff Lake's land use ordinances, to the extent that they substantially burden, unreasonably regulate, and discriminate against the Plaintiffs' religious land use, are void, invalid and unconstitutional on their face and as applied to the Plaintiffs on the ground that they violate the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, and the New Jersey Law Against Discrimination;

2.  A declaration that the denial of the Plaintiffs' Application is void, invalid and unconstitutional on the ground that it violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, and the New Jersey Law Against Discrimination;

3.  An order reversing the decision of the Borough of Woodcliff Lake Zoning Board of Adjustment and an order declaring that the Plaintiffs' Application to use the Property as a house of worship is hereby approved;

4.  An order directing the Borough of Woodcliff Lake Zoning Board of Adjustment to reverse its denial of the Application and grant the Chabad such variances and waivers necessary to construct its house of worship on the Property as applied for;

5.  An order enjoining the Defendants, their officers, employees, agents, successors and all others acting in concert with them from applying their laws in a manner that violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States

Constitution, the Religious Land Use and Institutionalized Persons Act, and the New Jersey Law Against Discrimination, or undertaking any and all action in furtherance of these acts;

6.    An award of compensatory damages against Defendants in favor of the Plaintiffs as the Court deems just for the loss of its rights under the First and Fourteenth Amendments to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act, and the New Jersey Law Against Discrimination incurred by the Plaintiffs and caused by the Defendants' laws and actions;

7.    An award to the Plaintiffs of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

8.    Such other and further relief as this Court may deem just and appropriate.

Respectfully submitted by the Plaintiffs this 31st day of October, 2016.

                              **STORZER & ASSOCIATES, P.C.**

        By:    _____
                              Sieglinde K. Rath
                              Robert L. Greene, *application for admission
                                  pro hac vice pending*
                              1025 Connecticut Avenue
                              Suite One Thousand
                              Washington, D.C. 20036
                              rath@storzerlaw.com
                              Tel: (202) 857-9766
                              Fax: (202) 315-3996

## CERTIFICATION

Pursuant to R. 4:69-4 of the New Jersey Court Rules, I hereby certify that all transcripts have been ordered and will be filed with the court after the matter has been assigned a judge for total handling.

**STORZER & ASSOCIATES, P.C.**

By: *Sieglinde K. Rath*

Sieglinde K. Rath
Robert L. Greene, *application for admission pro hac vice pending*
1025 Connecticut Avenue
Suite One Thousand
Washington, D.C. 20036
rath@storzerlaw.com

## CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that this matter is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding and that no such action, arbitration or administrative proceeding is contemplated at this time.  I do not know of any other party who should be joined in this action.

**STORZER & ASSOCIATES, P.C.**

By: *Sieglinde K. Rath*

Sieglinde K. Rath
Robert L. Greene, *application for admission*

*pro hac vice pending*
1025 Connecticut Avenue
Suite One Thousand
Washington, D.C. 20036
rath@storzerlaw.com
Tel: (202) 857-9766
Fax: (202) 315-3996