## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

VALLEY CHABAD, INC. and RABBI DOV
DRIZIN,

Civ. No. 16-8087 (JLL)

           Plaintiffs,

**JOINT DISCOVERY PLAN**

 v.

**CONFERENCE DATE:**

BOROUGH OF WOODCLIFF LAKE, N.J.,
ZONING BOARD OF ADJUSTMENT OF
THE BOROUGH OF WOODCLIFF LAKE,
N.J., et al.

March 9, 2017 11:00 a.m.

           Defendants.

## JOINT DISCOVERY PLAN PURSUANT TO FED. R. CIV. P. 26(a), 26(f), L. CIV. R. 26.1(b)(2), AND THE COURT'S JANUARY 13, 2017 ORDER

**1.      Statement of Facts and Legal Issues**

### Plaintiff's Submission

Plaintiff Valley Chabad has operated a clergy residence/Chabad house at its current location, 100 Overlook Drive (the "Property"), in the Borough of Woodcliff Lake for over 18 years.  Plaintiff Rabbi Dov Drizin is the Rabbi and Director of the Chabad.  Valley Chabad is the only Chabad house in the Borough, and attempts to bring the teachings of Judaism to those who may be interested in learning about it in a nonjudgmental and non-imposing manner.  The Plaintiffs offer various programs to fulfill their religious mission, including humanitarian programs such as Friendship Circle, Linking Hearts, crisis intervention, visitation to hospitals and senior citizen homes, counseling, and teaching Hebrew and Judaism to children, teens and adults.  The Plaintiffs have used the Property for small religious gatherings of 10-15 people and some Friday and Saturday services. High holiday religious services and large gatherings such as Bat Mitzvahs are held offsite at a hotel.

The Property is improved with an existing 1½-story, 3,194-square foot single family dwelling.  Approximately 1.27 acres, it abuts a farm, vacant land adjacent to the Garden State Parkway, the Garden State Parkway itself, and some residences to the northwest.  It is also located across the street from a 600-family synagogue.  Recognizing the limitations placed upon the

Chabad and its congregants, it started a search in 2005 for another property in Woodcliff Lake that would allow for construction of its house of worship. This multi-year and multi-property search was ultimately unsuccessful, in large part due to the intentional interference of the Borough and its officials who opposed the Chabad's location in the Borough.

The first property, the "Hathaway" property, is approximately 3.89 acres in size and identified by the Chabad in 2006. Once the Chabad entered into a contract to purchase the Hathaway property, the Borough then informed the Chabad of its intention to acquire the property for "recreational" purposes by eminent domain.

The second property, the "County Road" tract, is approximately three acres in size. The Chabad negotiated with the owners of those properties beginning in 2008. The Borough then informed the Chabad that it needed ratables and should abandon its efforts to acquire the County Road tract.

The third property, the "Galaxy Gardens" property, is approximately two acres in size and was identified by the Chabad in 2013. The Chabad entered into a contract to purchase the property, but the Borough again told the Chabad that it was interested in acquiring that property as well.

Left with no alternatives, the Chabad applied for a building permit in 2014 to remove the existing structure on the Property and construct a new house of worship. The permit was denied and the Chabad appealed the denial to the Zoning Board of Adjustment, seeking a use variance with respect to the three-acre minimum lot size requirement for religious uses in the Borough. A house of worship is prohibited in the majority of the Borough and is permitted as a conditional use only in residential zoning districts. Only 12 properties within the Borough meet the three-acre minimum lot size requirement for houses of worship and none are available for Plaintiffs' use either due to environmental constraints, current use, or being landlocked.

Eighteen hearings were held by the Zoning Board on the Plaintiffs' application from December 2014 through August 2016. The Board voted unanimously to deny the application, and rejected consideration of mitigating conditions in its Resolution. This denial occurred even after major revisions to the plans for the Chabad, including reductions in size, to meet bulk requirements under the Borough's Code.

The Board's determination occurred against a backdrop of extreme anti-Semitic hostility from both the government and community in the Borough. In addition to the Zoning Board's denial, an ordinance was passed to prohibit parking the entire length of the street on which the Chabad is located. The Borough code inspector has conducted unscheduled "inspections" of the property resulting in assessed fines of over $5,000.00. The Borough fire official has contacted a local hotel demanding information about the Chabad's off-site activities. The Chabad was denied its real property tax exemption for sixteen years.

The community itself made statements such as "The Black Hats are going to take over the town," "This will become another Monsey," and "We don't want the black hats walking all over the community." These comments were made in direct response to the nearby Ultra-Orthodox Jewish community of Monsey, New York. A group opposing the Chabad's application was formed in the community and the Chabad's professionals were cross-examined by the community in a hostile, irrelevant and anti-Semitic fashion. The Borough Code also treats the Chabad's use

differently and worse than nonreligious assembly and institutional land uses by imposing a three acre lot minimum.

The nine-count Complaint challenges the denial of the Chabad's use variance and the Borough's land use regulations as follows:

1. Counts I through IV allege violations of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. 2000cc *et seq.*, by substantially burdening the Plaintiffs' religious exercise without using the least restrictive means of achieving a compelling governmental interest, by treating the Plaintiffs on less than equal terms with nonreligious assembly and institutional land uses, by discriminating against Plaintiffs on the basis of religion and religious denomination, and unreasonably limiting religious assemblies, institutions, and structures within the Borough's jurisdiction.

2. Counts V and VI assert claims under 42 U.S.C. § 1983 and allege that the Defendants deprived Plaintiffs of rights guaranteed to them by the First and Fourteenth Amendments to the United States Constitution, by discriminating against them on the basis of their religion and by burdening their ability to freely exercise their religion.

3. Counts VII, VIII, & IX assert state law claims brought under this Court's supplemental jurisdiction as they arise from the same operative facts as the federal claims.  Count VII is an appeal of the Zoning Board's decisions under the New Jersey Municipal Land Use Law, N.J.S.A. § 40:55D-1 *et seq.*  Count VIII asserts claims arising under the common law.  Count IX asserts discrimination against the Plaintiffs based upon religion under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.*


### Defendants' Submission

There is no evidence that the decision of the Zoning Board was based on the discriminatory animus of the objectors. The Board's resolution was based on a legitimate and correct interpretation of the Zoning Ordinance. RLUIPA does not allow a religious institution to operate "wherever it so chooses, without regard for zoning rules" and such a position is "simply unreasonable and not supported by the statute or by the First Amendment." See Christian Methodist Episcopal Church v. Montgomery, 2007 U.S. Dist. LEXIS 5133, 30-31 (D.S.C. Jan. 18, 2007). "[S]o long as a municipality applies its codes uniformly and does not impose an unjustified substantial burden on religious exercise, it may apply traditional zoning concerns – such as regulations addressing traffic, hours of use, parking, maximum capacity, intensity of use, setbacks, frontage – to religious uses just as they are applied to any other land uses." Statement of the Department of Justice on the Land-Use Provisions of the Religious Land Use and Institutionalized Persons Act (RLUIPA, (December 2010), p. 3-4.

Many courts have approved the use of zoning ordinances to limit purported religious use of property in residential zones. Messiah Baptist Church v. County of Jefferson, State of Colo., 859 F.2d 820 (10th Cir. 1988), cert. denied, 490 U.S. 1005, 109 S.Ct. 1638, 104 L.Ed.2d 154 (1989) (upholding zoning provision which precluded construction of a structure designed to accommodate a place for worship, administrative offices, a school, and a parking area for 151 vehicles in an agricultural zone); Grosz v. City of Miami Beach, Fla., 721 F.2d 729 (11th

Cir.1983), cert. denied, 469 U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984) (affirming the prosecution of a rabbi who conducted worship services in his home in violation of zoning laws); Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio, 699 F.2d 303 (6th Cir.), cert. denied, 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983).

The property on which Valley Chabad seeks to build a synagogue is particularly ill suited for that purpose. The initial application contained nine ("D-3") variances pursuant to N.J.S.A. 40:55B-3. The applicant also requested ten ("C") variances under N.J.S.A. 40:55B-70(1 and 2). The original application also requested nine waivers from the requirements for development as set forth in the Site Plan Review Ordinance of the Borough, Chapter 292. It was Chabad's intention to create numerous variances and waivers so that it could then alter its plans and reduce the number of variances under the guise of being reasonable. Examples of the creation of variances include, but are not limited to, proposing a larger structure than possible to fit on the property, proposing two monument signs when only one is permitted which were three times the size permitted, proposing fences of six feet in height when the limitation is five feet, proposing a retaining wall of 20 feet in height located one foot from the side yard property line of a residential property and which retaining wall was within one foot of a 24 inch storm sewer main making it virtually impossible to construct the retaining wall  and which would prohibit proper maintenance and replacement or repair of the storm sewer main, proposing inadequate drive aisles in violation of design standards that would not be approved by the fire department, proposing an inadequate buffer from residential uses, proposing a retaining wall with vegetation that would die during northeast winters. In addition to the foregoing, bulk variances that could have easily been eliminated at the outset were requested as follows: required front yard setback was 50 feet and the applicant proposed 48.5 feet. The set back requirement for the rear yard is 50 feet and the applicant proposed 49 feet. The side yard setback requirement is 50 feet and the applicant proposed 47.3 feet. When the Chabad eliminated these variances, it was not done in good faith, it was part of a pre-conceived plan and  attempt to create a false impression while ignoring the goals of the Master Plan and comments of members of the Board.

The evidence will show that the delay in completing the hearings was the result of intentional actions taken by the applicant and its attorney, who were unavailable for look periods of time, despite the efforts to accommodate them.

The three properties the plaintiff attempted to purchase before the present property have nothing to do with the current application. In each instance, the plaintiff voluntarily terminated its negotiations to purchase the properties.

2.     Have settlement discussions taken place? Yes _____No__X____    It is the Defendants' position that the Plaintiff has declined to entertain settlement discussions. Plaintiffs state that they believe that this case may be resolved in whole or in part by mediation and request a referral for such alternative dispute resolution (see paragraph 9, below).

3.      Plaintiffs will serve their Initial Disclosures prior to the Court's Scheduling Conference on March 9, 2017, within the period set by Fed. R. Civ. P. 26(a)(1)(C). Defendants have served the information required by Fed. R. Civ. P. 26(a)(1).

4.      No discovery has been conducted to date.

5.      The parties do not anticipate filing any dispositive Motions prior to completion of discovery.  As discovery is conducted, there may arise the need for Motions to compel discovery.

**6.      The parties propose the following:**

   (a)      Plaintiffs anticipate that discovery will be needed on the following subjects:

     A.  Plaintiffs' proposed religious land use;

     B.  Plaintiffs' application for a building permit, appeal of denial of the building permit, application for a use variance, other variances and other relief;

     C.  Communications among or between Defendants and staff, Zoning Board of Adjustment members, mayor, Borough Council members, other elected and/or appointed officials, and third parties concerning Plaintiffs' application and use of property in the Borough;

     D.  Alleged zoning or fire code violations of the Plaintiffs in relation to property owned or used by them in the Borough;

     E.  Any litigation in which the parties have been involved including tax appeals;

     F.  The real property tax exemption status of properties owned by the Plaintiffs in the Borough;

     G.  Defendant Borough's Code, including the Land Use and Development Regulations;

     H.  Defendants' land use policies and procedures;

     I.  Any asserted governmental interest(s) supporting the challenged decisions and/or laws;

     J.  Any alternative means considered or available to achieve such asserted governmental interest(s);

     K.  Any statements or actions by the Borough or third parties with respect to the Plaintiffs' acquisition of any real property in the Borough;

L.  The existence and regulation of religious land uses within the Borough's jurisdiction;

M.  The existence and regulation of assembly and institutional land uses within the Borough;

N.  The availability of property within the Borough;

O.  The existence and regulation of land uses in the zoning district and the vicinity in which Plaintiff's proposed religious land use would occur;

P.  The adoption and application of the zoning code provisions applied to Plaintiffs;

Q.  Issues related to hostility toward Orthodox Jews in the Borough of Woodcliff Lake; and

R.  The disputed factual allegations set forth in the Complaint.

Defendants anticipate that discovery will be needed on the following subjects:

A.  Plaintiff's liability and damage claims.

(b)     Discovery should not be conducted in phases.

(c)     Both parties will request permission to serve 50 interrogatories (without sub-parts). Interrogatories and Requests to Produce Documents shall be served by March 15, 2017 and responses served by May 15, 2017.

(d)     Plaintiffs will request permission to conduct 20 depositions.  Plaintiffs believe that they will need to exceed the one day/seven-hour limitation for 30(b)(6) depositions, the amount of time to be determined by the parties who will confer beforehand on such limitations. Defendants will request to conduct 10 depositions.  Fact depositions shall commence on or after June 15, 2017 and shall conclude by the end of discovery.  Expert depositions shall not begin until after expert reports are served as described below and conclude by the end of discovery.

(e)     (f)     **Plaintiffs' Position with respect to experts' reports.**

RLUIPA provides that plaintiffs and defendants have the burden of persuasion on different elements of a claim under the statute:

If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2000cc of this title, the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion.

42 U.S.C. § 2000cc-2(b). As such, Plaintiffs believe that each party should simultaneously serve expert reports related to those elements on which they have the burden of persuasion, and the opposing party should have the opportunity to then serve expert reports in rebuttal. Plaintiffs suggest that initial expert reports shall be served no later than October 15, 2017 and rebuttal expert reports shall be served on December 15, 2017.

**Defendants' Position with respect to expert's reports.**

The Plaintiff should serve their reports and Defendants should have 60 days to respond.

(g)      Motions to Amend or Add parties to be filed by April 15, 2017.

(h)      Dispositive Motions to be served within 30 days of completion of discovery.

(i)      Factual discovery to be completed by March 1, 2018.

(j)      Expert discovery to be completed by March 1, 2018.

(k)      This Court has entered a Rule 502c Order in this matter.  The parties also anticipate entering an ESI Order.

Additionally, the parties request that the Court include the following order regarding inadvertent disclosure of privileged materials.  If, during the course of discovery, either party deems it necessary, the parties will enter into a further protective order.

**ORDER REGARDING INADVERTENT DISCLOSURE
OF PRIVILEGED MATERIAL**

The above-named parties having agreed to disclose certain documents in an electronic format and each for their benefit in obtaining prompt disclosure of documents that they wish to review without the necessity of obtaining an order of the Court, and wishing to preserve all of the rights accorded them by Federal Rule of Evidence § 502, hereby agree and stipulate as follows:

1.      All parties agree that they have gathered and produced documents to the parties herein in accord with requests for the production of documents.

2.      All parties have made and will continue to make diligent efforts to determine all documents that are subject to attorney client privilege or work product immunity.

3.      All parties agree that any inadvertent inclusion of any privileged material shall not result in the waiver of any associated privilege nor result in a subject matter waiver of any kind.

4.      If, through inadvertence, a producing party discloses information and/or documents that it believes is subject to attorney client privilege or work product immunity it may subsequently, within a reasonable period after the discovery of such inadvertence, designate such information and/or

documents as privileged. After such designation is made, all receiving parties shall treat the information and/or documents accordingly. If the receiving party prior to the designation has disclosed the information and/or documents, the receiving party shall make a good faith effort to have the information and/or documents returned.

5.      All parties agree that after notification of inadvertent disclosure of privileged material, no copies will be made of the inadvertently disclosed materials.

6.      Nothing in this agreement shall be construed to mean that any inadvertent production shall in any way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege or work product immunity for such information. If a party has inadvertently produced to the other party information subject to a claim of privilege or immunity, the other party upon request shall promptly return the information for which a claim of inadvertent production is made. The party returning such information may then move the Court for an order compelling production of such information, but said party shall not assert that inadvertent production constitutes a waiver.

7.      This Order shall be without prejudice to the right of any party to oppose production of any information on grounds other than confidentiality.

(l)      A pretrial conference may take place on or after April 1, 2018.

(m)      Neither party requests a jury trial.

(n)      Trial date:  To be scheduled by the Court.

7.      The parties do not anticipate any special discovery needs at this time.

8.      The parties do not have any special discovery needs other than those set forth herein.

Plaintiffs will make a request for electronically stored information, including the following categories of information:  electronic documents (such as Microsoft Office Word, Excel and Powerpoint files, text documents, PDFs, web pages), emails, attachments and other files stored on a mail server, locally saved mailboxes or on the server of a third-party mail provider, scanned documents, databases, images, text messages, instant messages and chats, and phone records and voicemail related to the topics described *supra*.

The parties are in the process of exchanging information regarding the description of documents so that they can develop an ESI plan.  The parties have agreed that they will exchange such information by March 17, 2017.

9.      This case is not eligible for compulsory arbitration pursuant to L. Civ. R. 201.1 because it is based on an alleged violation of a right secured by the Constitution of the United States.  L. Civ. R. 201.1(d)(2)(A).  Counts I-VII; IX and X are eligible for voluntary mediation.

Count VIII may not be eligible for mediation because this count seeks judicial review of the administrative decision of a Government agency where the review is conducted on the basis of the administrative record.  The parties believe that this case may be resolved in whole or in part by mediation and request a referral for such alternative dispute resolution.

10.   Is this case appropriate for bifurcation?  Yes_____No__X__

11.   We do not consent to the trial being conducted by a Magistrate Judge.

**Plaintiffs Valley Chabad, Inc. and Rabbi Dov Drizin**

By: _____                Date: March _6_, 2017
        Robert L. Greene, Esq.

By: _____                Date: March _6_, 2017
        Sieglinde K. Rath, Esq.

**Defendants, Borough of Woodcliff Lake, NJ, et al.**

By: _____      _____Date: March _6_, 2017
        Howard B. Mankoff, Esq.